and call our second case of this morning. United States v. Jabateh, number 18-1981, Mr. Schoenberger and Ms. Zosman. Whenever you're ready. May it please the court, my name is Peter Schoenberger. It's my privilege this morning to represent Mohammad Jabateh, who is the appellant here, was the defendant below. I'd like to reserve two minutes for rebuttal. Jabateh, I mispronounced, I'm sorry. It's the pronunciation and the spelling are inconsistent in the record. And I'm coming down with a cold, so I apologize if my voice sounds a little froggy this morning. This appeal raises starkly a question whether our system of law can and will live up to its promise of objective and impartial justice for all, including for those convicted on the basis of. So you've got a you've got a 1546 conviction for immigration. Claim that immigration violations in terms of the statements made, then you have a 1621 for general perjury. And you're saying that 1546 cannot be read to apply to oral statements. It can only apply to a document. Section 1546 properly read does not apply to oral statements, only to written statements. And it's the history of the statute that most clearly shows that. If we'll get into that, but even if working backwards, even if. A court were to come down generally in your favor, is the error so obvious that it gets you over the plain error burden that you have because there was no objection? Yes. The plain error rule as applied to to the application of statutes, criminal statutes in a given case does not depend on the claim being obvious. It doesn't depend on a plain error. There has to be an error. It has to be plain or obvious. And you're saying it doesn't have to be plain or obvious in this case. It's plain or obvious after applying the rules of statutory construction. So in case after case, this court has held that novel or difficult arguments of statutory construction. And the Supreme Court the same has held that when the question of whether this statute properly construed applies to these circumstances and is plain error when it is when the court of appeals reaches that decision after applying the rules of statutory construction. But when you I think both you and Mr. Ozmer focus, as you should correctly, on whether the I the words with respect to in 1546 can take. As statement made under oath relating to a document, can they make it ineffective? It's made under oath oral. That's exactly you're saying that you say on page 26 of your brief. Must the false statement be in the document or is it enough that the statement be made with respect to a material statement, a false material statement that is in the document? If it is the latter, then you lose. Right. That's the government. And why isn't it the latter? Well, it isn't because this statute was enacted in 1924 as written in 1924. And until amended in 1952, the language was very was clear and could not be applied to a an oral statement. That's correct. OK, so if we accept that, then what is the amendment that caused it to expand its application to a new realm? Because of 52, they added the language with respect to a material fact. And so what does what did Congress. What was the function of the amendment in 1952 that says with respect to a material fact that first, the legislative history of the 52 act, which is a broad reform or revision of the entire immigration code. It wasn't this. This was not the provision being focused on by Congress. This is a change made to a non-immigration statute related to immigration in a long list of such statutes. And the legislative history tells us that no substantive change was intended by the 1952 amendment. The Supreme Court held that in Campos Serrano in 1971, looked at these same amendments and told and pointed this out. And we look at the legislative history ourselves and we can see the Supreme Court's right. They don't have to be right because they're the Supreme Court. But it's what they said. And they are right. So that even if that weren't the case. Yeah. That the grammatical changes that were made in 1954 simply didn't affect the contextual change that the government urges. In other words, legislative history might not be relevant. You could simply say even read as ordinarily understood. This applies. This applies. This applies to only the statements of a material nature that are in the documents themselves. But that turns out to be wrong. One could say that, but it turns out to be wrong. We don't we do look at the plain language first. But if there is ambiguity and here there is this ambiguity as to what the materiality language attaches to, it turns out. But could you clarify that? And maybe I didn't speak precisely because I thought I was restating your argument. So let me let me try again. Well, I agree with you. You argue at points that 1546 is ambiguous, but then other parts of your brief, you seem to say it is not it. It is read only one way and it is to criminalize statements in the documents themselves. In other words, that's why 1546 shouldn't have been charged here. Because when you look at the amendments that were made to the statute from the 1924 version, the 1952 amendments merely made clear that this is to focus on material statements, not any old. That is so. So if that's the case, then the legislative history is almost irrelevant, I would assume, to your argument. Because you would say you don't even need to get to that. What you do is you look at the language. And that's where you started, too. You were looking at the language. Of course, we start by looking at the language. Well, I if you read the language and you find it to be unambiguous in my favor, then I'm done. But I don't think that would be honest. I don't think that would be honest. I think it's somewhat analogous case. Asher, I'll say this whole 1546 is one big paragon of meandering. Right. Just want to put it in that position. That's right. And I don't know. I don't know anybody who would disagree with him on that. No. And it's so the tools of statutory construction that were used in Ashraf to construe the same paragraph, a different clause of the same paragraph of the same statute lead to my result. But let's go back to Judge Mady's question. How does legislative history even play into this at all? And I should say, as does the Supreme Court decision encompass around, which I don't think was even mentioned in Ashraf, but is is under a different paragraph of the same statute with the same kind of problem. Let's go back to his question. How does legislative history help you at all? The legislative history showed it helps us by confirming that no substantive change was intended by the by the adding of this clause in 1952. It's and the the only way that you can make sense of the added language is to argue with the way I'm arguing and to read it the way I'm reading it, which I think is more consistent with the plain language because it produces. You know, it's funny only when you look at certain things like Rico. Even the person who wrote Rico for Congress said we never intended there to be a civil Rico. Never thought of it at Supreme Court said years, 15 years later. Yep, there can be. So you look at we start with the words and the words seem to say that if you make under oath a false statement with respect to something that might be in it, that would be a material fact in a document. You can be convicted of violating a statute that says you've made a false statement in connection with an immigration matter. And oath we normally think of as something where you say, I swear under, you know, under oath that the statements here are true. Correct. We normally think of an oath being oral, do we not? Often, yes, but also there are many government documents, including many immigration documents, including the documents at issue here. That's why 17 are subscribed under oath. That's why 1746 does cover written. But it was seen. Oh, that's the government's argument about 1746 is clearly wrong. The 1746 extends the effect, the traditional effect of a written document under oath, which is to say a document signed before a notary. A seven, a notary, a notarized document requires a signality of the notary unnecessary. That's all 1746 did. It doesn't extend under oath. But this says knowingly makes under oath comma or is permitted under penalty of surgery and perjury under seven sections. Sixty seven is an alternate to the etcetera. So there's really two ways to get there. Two paths to get to a false statement with respect to a material fact in an application affidavit or other documents. There are written oaths and then there are written statements under penalty of perjury. But it doesn't say written oath, does it? No, it's oath. It's an oath. And oaths in these documents existed only in writing. The documents existed only in writing before. In his decision, I mean, didn't didn't in some in substance, the district court properly account for the fact that the defendant lied multiple times in multiple contexts in connection with his immigration application and his interviews. Are you are you focused on the may I ask if you're focused on the sentence here by asking that question? Yes. Yeah. So it's based on the record that that was made by the interviews. Right. So we have the pairs of counts that we talked about before. One pair of counts focuses on a single question. That question is, have you ever killed anyone on account of religion, ethnicity or politics? And that's two counts. And the other is, have you ever procured an immigration benefit by fraud? And that in turn is based on any or all of three said to be based on any or all three falsehoods in the oral. So this is a question asked about when becoming a life of lawful permanent resident, reflecting back on the application for asylum status many, many years earlier. Is there any question about that? Absolutely. And I've challenged on playing the principles of perjury law. All that the government never proved, despite all of the horrible things that were described at the trial. Never was a single one of the statements, particular statements attributed to Mr. Javita and said to be false, shown to be false. Well, he was not. He was asked if he committed any any of these acts of genocide, brutality. They never proved genocide. There was no witness said and no you could not infer genocide. The judge at sentencing accused of genocide. If he's asked the question and he says no. Isn't that what occurred? No. Well, the question is exact. No to exactly what question is the point that I make over and over again. Exactly what is the question on question 10? Have you procured by fraud subsumes? According to the indictment, the first has to refer to three particular some particular way in which that answer is false. And the indictment suggests three such ways. So it's always not one of which was proved beyond reasonable doubt to be specifically untrue. So his position is that he properly denied the accusations that were made of the precise question that was asked in the precise way that the indictment alleges. OK, yeah, that did not turn out to be the case, of course, because there was too much. There's a trial and many witnesses appeared and in fact, right. Disclose what he did. And those and and what the witnesses said, none of the what the witnesses said. And you will look and look in the government's brief and you won't find this. It shows that the particular answer to the particular question was untrue. Applying the ordinary rules that we apply to false in this circuit to false statement cases. If he was asked, have you ever committed any act of genocide or brutality, et cetera, et cetera. So they don't say that the answer at trial, they did not say the answer to the genocide question was false. They didn't say it was that the answer no was false because he did commit genocide. In fact, Liberia, the Liberian Civil War, terrible, though it was was not a genocide. It's not Rwanda. It's Liberia. And so the allegation was that he killed him as a combatant in war for reasons of politics, race, ethnicity. And this was not shown. They described particular killings. Witnesses described killings. Every one of those killings is described as having had a reason or purpose, not necessarily a justified or proper one. And that reason or purpose for those killings described in the wit in the evidence and attributed to Mr. Javita is not prohibited. Both committing murder and acts of brutality would be sufficient to deny a claim for citizenship. No, no, not this question. This question is a persecution and discrimination question. And you have the motive had to be proved the way it would have to be proved in a civil rights case. What was the motive for this killing? Was it a killing in war of an of someone perceived to be an enemy or a spy because they're associated with the other side in the war? Or was it to persecute that person on account of their religion or politics? Were there not acts of brutality on the basis of religion, ethnicity, tribal affiliation? So the witness, so the evidence shows and so history shows. But it was not attributed to Mr. Javita by a witness at this trial to show that his answer to that question was false. By evidence in a criminal case, applying the rules we apply in criminal cases. That's exactly the point. So your position is he did not lie under oath about circumstances in Liberia? Applying the standards that we apply in criminal cases, that is correct. If the government did not prove. Let's just throw the questions on this area. Could you address the issue that you brought up about the procedurally unreasonable sentence? Yes. Does it appear that there's any precedent outlining the required process for when a judge should make a sentence consecutive or concurrent? Right. So I'm looking at all the rules, the statutes and rules. Which are rules of our sentencing system that govern that question. This is one of the questions that concerned Congress in 1984 when they enacted this statute to go into effect in 1987. You could not have a reform of radically indeterminate, overly discretionary sentencing guided by guidelines. Which is what Congress determined to do unless you could control the use of consecutive sentencing in multi count cases. Congress recognized that and the Sentencing Commission recognized it. So they dealt with it in three ways. One. The judge before in making the consecutive after this is completely after doing the guideline calculation. The judge must then reconsider. Consider it says the thirty five fifty three factors. But the statute has required the judge already to do this. So I say reconsider the thirty five fifty three factors as they apply to the consecutive or concurrent question. The judge should then and the guideline makes this clear. I think it's in 5G and it's mandated in the statute. I'm interested in the procedure. This is the procedure. Don't you start by saying what do you think the appropriate reasonable sentence under the guidelines should have been? What I said was you start by proper calculation of a guideline sentence. And then in this case, under these circumstances, the judge could have given accepting the convictions, which I'd say would be wrong. But we're talking about sentencing here. We would be accepting the convictions. The judge would impose some upward departure or variance because it was lying about human rights abuses. And so we know that in the subsequent amendment to the guideline that there was a sentencing commission determined that there should be an upward adjustment for that purpose. I'm trying to get a number from you. And levels Congress. The Sentencing Commission said 10, not more than 10 levels, not more than 10 levels. And the judge here imposed 26 levels. There was a consecutive four consecutive maximum sentences. It's a 1600 percent variance. So and the case law of this court says. You look at the sentencing memorandum. It's like this judge is, you know, for him, this is genocide. These are these people with very graphic stories. There's a dozen of them at least. And this is like nothing he's ever seen before. So in effect, a sentencing guideline range of 15 to 21 months ultimately becomes 360. When you would make these sentences, you add on 26 levels. Correct. And then you make it consecutive. That's correct. And that's wrong for the two reasons that I articulated in the brief. One, it is not genocide. So you can't say this is making me think about genocide. It's not genocide. Genocide is sui generis. It is the worst, the most heinous human rights violation and international law crime. And it depreciates the seriousness of that claim. When there is genocide to say that something else, no matter how bad is genocide, that is not genocide. There's no second. Was there a problem with it? And I gather maybe there wasn't for the for the judge in this case to sentence for acts that occur in a different country. No, I don't. I don't think so. I think I think the genocide in the area that could be a basis for sentence. But there was no genocide. But it's if there had been, you know, the human rights abuses. If you found that he lied in applying to become a lawful permanent resident of the United States about prior conduct in another country of a human, that was a human rights abuse, that would be an appropriate consideration. The Sentencing Commission decided that in a couple of years later and said it could add as many as 10 levels to the sentence, but it would not produce a the closest thing to a life sentence that you could do, which is what the judge did. And and if you do the judge, we do have a discretionary system. And if you do that, you have to give a compelling and clear and accurate justification and explanation for it. And that he did not do argument is that this was an abuse of discretion. Absolutely. And what would have been the appropriate sentence from your standpoint? Something would be a would have been some kind of upward adjustment from the guidelines not exceeding the 10 levels, which were guided by the Sentencing Commission in the subsequent amendment or something very like that. If the judge had a clear articulation for it, but not to take two counts that charge the same crime and max them out, attach to each other and then again to do it again just to produce the longest possible sentence. Well, you say two counts to charge the same crime. But when you look at 1621, that uses the general perjury statute, it uses the words willfully. That's not in 1546, a four. And under oath is in 1621. That's and then you also have to have 1621 has to have false testimony corroborated under the two witness rule. At least that's what's been read into it. So they seem to be very different, not very, but different. If you're asking about the Blackbird or argument, right? You know, the two witness rules, the procedural matter, and I don't think that's an element that that creates a difference between two offenses. The each one must be under oath. There's a direct parallel in my reply brief. But I actually put it in the form of a chart to show the direct parallelism of the counts. But even if you don't find technically that there's a perfect Blackbird violation, the way I showed in the reply brief to get back to the sentencing argument, that's where I said they were the same offense. And I mean it to all intents and purposes in terms of harm to the public and or anything else public. Any legitimate purposes of sentencing. We have to each of alleged offense is charged under two different statutes. And then that is taken advantage of at sentencing to to produce this excessive double maximum sentence. I'd like to reserve my time. Thank you very much. Thank you. Good morning, Your Honor. May it please the court. Robert Osborne, on behalf of the government. A lot of ground to cover. I'll start with 15. Why don't we start with 1546 and how you read it? Sure. So it is a plain reading of the statute, Judge Ambrose, as you suggested. And I think to the credit of my friend, Mr. Goldberger, he won't even stand here and tell you that the clear language doesn't support our position. What he wants to rely on is what he calls the history of the statute. We don't get to the history of the statute when you have language that's as clear as this. But if we are talking about history, the one thing I want to highlight which is this is crystal clear. I don't want to go that far. Sure. I don't want to say anything in the statute is crystal clear. But one thing I do want to highlight if we are talking about history that hasn't been mentioned is the 1976 amendment. That's when Congress synthesized all the various statutes that concern false statements. And that's when it made very clear that there are oaths and there are statements under penalty of perjury. One oral, one in writing. 1621 was amended at exactly the same time for exactly the same purpose. And that's the reason today when you or I or anyone stands up in court and raises their hand and swears an oath to make an oral statement that is subject to perjury under 1621. They made the exact same dichotomy here in 1546. And then on top of that, we have the very clear reading. You make a statement under oath as true, making an oath as true, a false statement with respect to a material fact in an application. I do want to say while I'm standing here that perhaps we, I don't know if we conceded it or just didn't say anything about it. I'm not even sure it's entirely clear that before 1976 that this wouldn't have applied to an oral oath. The true case in the Ninth Circuit says an oath can be oral. And this refers not just to a document, but also to an application. And an application in immigration terminology is not necessarily only in writing. And the problem here also, if one were to say that let's go. I mean, pre-52 says whoever knowingly makes under oath any false statement in an application affidavit or document. Are you saying that that is not limited to a writing that has to that can also be something orally? Yes, I'm saying that as an aside, it's possible. It doesn't matter because we're not here before 1952 anymore. And now we have a clear statute which has the clear. I think it is relevant. Can you explain how that theory works? Sure. In immigration practice, as I know the court is aware, it's very much an oral as a written process. The first confrontation that a person normally has is with an officer at an embassy or locally. And we see that in this very case. What happens in this case, they're following the procedure very carefully. He makes the application for permanent residency in 2001. But then they interview him twice after that in 2007 and in 2011. Each time the officer puts him under oath and each time reads it to him again verbatim, the exact same statements. This is a process in which the oral part is as important as the written part, the face to face part. And so it would be quite striking to have a conclusion that 1546 doesn't apply to that part of the application process as well. If you look at 1546, and I know this court did in Judge Fuentes did this very carefully in Asheroff, it's a long statute that covers all sorts of falsity and fraud in immigration. It covers counterfeit documents, false impersonation, and here false statements. It would be beyond odd if the statute only applied to the actual writing and not this very important oral part of the process as well. And it wouldn't though, right? The examples you gave are all documentary offenses. They're misrepresentations in the documents themselves or in the subsequent presentation of those now falsely created documents. So that's the documentary part of it. The perjury statute takes care of the problems in person. So why is it an odd result to say, well, you can certainly perhaps be charged with the offenses in the documents under 1546. You can charge with perjury under the perjury statute. I assume 1001 is out there somewhere you could be considered to be charged for. Why is that sort of why is that why is that an odd result? So, Your Honor, the perjury statute also covers writings. And so Congress has made it clear in both statutes that it's addressing oral and written statements. And to be clear, I've said this is an aside. The particular case in front of us now is not a difficult case. Because in 2011, he is making false statements with respect to material facts in the document. He is being asked about a document. He's being asked, is everything in here true? Under oath, he says, yes, it's true. That's what he was convicted of. And so we don't have to I said it's an aside. We don't have to reach further to say with an oral statement alone without any document in front of the person suffice. Here, it plainly suffices because he made a false statement with respect to material facts that are in the document. That's the plain language. The material facts have to do with what specific events in Liberia? Yes. Well, if I could get to that in just a moment, Your Honor. The other thing I want to say, and actually this applies to every single argument being presented by the appellant, is the plain error standard, of course, matters. I disagree with Mr. Goldberger that you go through the entire statutory analysis and then decide whether it's plain or not. Plain error means that under existing law, this interpretation is plain. And, of course, there are no cases at all supporting the appellant's position. There are no cases at all. So what do you make of the fact that since 1924, it seems that no federal court has had occasion to consider the argument that the government is raising? That's an interesting question, Your Honor. This statute has been charged, I can tell you, the way this office charged it in this case. It hasn't been challenged. It was an afterthought even in this case. No one in the district court proceedings, including the very experienced judge, ever looked at this statute and said, what are you doing here charging this statute? I think the reason is that the language is clear. But I just have to emphasize that the Supreme Court, in the Marcus case and many other cases, has said that lower courts must enforce the plain error rule as it's been interpreted by the Supreme Court. You don't get to say, or I don't get to say, well, I see an error here, so I'd really like to fix it. It has to be plain under existing law, and this certainly is not. Getting to Judge Fuente's question regarding the falsities here, the statement that Mr. Goldberger made about there not being proof of the exact falsities bears no relation to this record whatsoever. There are two sets of falsities here. The first is with respect to this question eight that was asked, and that was, did you ever engage in any killing on the basis of nationality, ethnicity, political opinion? The record was replete with evidence of that. And Mr. Goldberger likes to say, well, these were combatants at war and thus outside that. In a remarkable passage in his brief, analogizes this to our American Civil War. This was not, from what these victims testified, this was not the blue and the gray meeting on the field of Antietam. These were atrocities committed against local citizens, local villagers, based on their religion and based on their association with different ethnic national political groups. I don't, you know, we've given many examples in our brief. I'll highlight one or two. I'll go further if the court wishes. There was that woman, Tina, who was murdered by the defendant. Her only offense was living in the village and allegedly having a relationship with a member of the other tribe and the other militia. Tina is taken out. The men hold her legs apart. And Mr. Jabotas shoots her in the vagina, debasing her at the same time that he's murdering her. To say that these are combatants at war is an absolute insult. And what happened is that at trial, the defense never made this argument. The defense never suggested to the jury, oh, you've heard all these terrible things, but these were combatants in a civil war. The defense at trial was, he's the wrong guy. He didn't do this. There are all these vendettas being played out to falsely accuse him. But no one stood in front of a jury and said to him what Mr. Goldberg said to the three of you this morning, which is, you know, there's no evidence at all. I could go on regarding the different villages in which the men just stormed in and murdered and otherwise abused, horribly abused, women and children and anybody who they came across. Fundamentally, of course, this is an issue for the jury. Maybe he's going to get up and argue with me that, you know, Tina somehow was a combatant or these other people were combatants.  But were those killings motivated by these different prohibited purposes? And if they were, then the jury has to answer, did he knowingly lie about that? The jury did reach its conclusion, and there is overwhelming evidence in the record that supports it. The other part of the false statements involved this question 10, which asked, did you ever procure an immigration benefit through a falsehood? Now, he wants to talk about the specific questions that were asked about a harm or a crime. But what the defense on appeal has never addressed is the big lie, which is the affirmative misrepresentation that Mr. Javits had made about what he did during the Civil War. He gave a six-page written typed personal statement to the immigration authorities. It's around page 80 in the appendix. And it is a lie from the first word to the last. This was when he, and he's asked about it, as this process works, at every stage along the way. And his statement is not just that, the main false statement is he was with the Special Security Service, sort of a secret service officer at the executive mansion. Yes, during the key years of the Civil War. Completely false, and we presented numerous witnesses to show that that was false. Including the leader of the Special Security Service itself. That's something that defense just won't address in any of their briefs. But then he went further and talked about how he was persecuted. He said that his wife was raped. That men loyal to the opposition came in and beat him and whipped him and handcuffed him. He knows exactly what persecution is, and he's telling this myth about the persecution being applied to him. And so then he's asked, did you commit any crime, did you commit any harm? In the context of all of this, the meaning of that question is obvious. And he lies about that, too. By saying, no, I didn't, leaving out any admission of this horrific list of atrocities. A lot of what you're saying seems to go to the amount of the sentence. In effect. What was done was so egregious, so wrong, that you have to go way above the normal guidelines for this type of crime. So it applies to a couple issues. The second argument that the appellate made is that the evidence was insufficient to prove these falsities. I think I've addressed that as much as I need to. Why don't we deal with the reasonableness of the sentence? In other words, was it procedurally unreasonable because there was no real rationale given as to why the sentences should be made consecutive as opposed to concurrent? Right. So as I read the briefs, and as your honor suggests, this was purely an argument of procedural unreasonableness. It's the first time this morning I'm hearing inklings of substantive unreasonableness. There is not an argument in the briefs that no reasonable court can impose a 30-year sentence in this case. The argument was procedural, which is procedural. And there's one page saying that this, in effect, was not genocide, as genocide is commonly understood. But so that may touch on whether the on substantive unreasonableness. But let's deal with procedural reasonableness here. What metrics should we use in determining whether a sentence should be whether we should get into play on when a district judge says, I'm going to make sentences consecutively as opposed to concurrently? And before even that question is, does the judge need to put a rationale in the record or can we infer one from the record here that would at least tell us why the judge was sentencing consecutively? This court has made very clear that the district court is required to give a sufficient explanation to permit appellate review, to state its reasons. And Judge Diamond did that here in abundance, not just at the sentencing hearing, at which the transcript is about 10 pages worth of comments, but then wrote a 36-page memorandum stating in detail the reasons he found the sentence necessary. With regard to consecutive sentencing, he followed the procedure exactly correctly. What he did was he departed slash varied by a specific number of levels. What I'm saying, what is the procedure that one should undertake in order to determine whether a sentence, any sentence should be consecutive as opposed to concurrent? I believe the answer is to do it the way the judge did it, which is identify the range. This is a helpful, I'm not sure this is absolutely required, but it's certainly correct when it was done here. Identify the range, which the court did. It said I'm going to depart upward by 26 levels. That produced a range of 292 to 365 months. Identify the final sentence, either within or outside the range. Judge says my guideline sentence here, my final sentence, is 360 months. What the guidelines then command, if you look at I believe it's section 5G in there, it says once you've identified the guideline sentence, impose the entire sentence on any count that can bear that sentence. And if it can't, if for example you had as here statutory maxima less than 30 years, then impose the sentences on those counts to run consecutively to the extent necessary in order to impose the guideline sentence. That's all laid out very clearly in the guidelines. And so I really haven't understood the defense argument here as to why this was in any way erroneous. Now if you were to ask, does the judge have to do all that? Does the judge have to do everything Judge Diamond did in terms of identifying the range and then stacking the sentences this way? I'm not sure that's necessary. I think under the court's precedent that if the district court gives a sufficient explanation that allows appellate review, then that would be sufficient by itself. But here... I have a note here that the guideline range, tell me if it's inaccurate, is 15 to 24 months. 15 to 21 is what it was. Right, exactly. 15 to 21 was the original guideline range, but in the sentencing transcript the judge said I go up by 26 levels and that's what produces 292 to 365. Judge doesn't have to do that as a variance. For a departure, perhaps. But as a variance under Booker, the court can simply give a sentence outside the guideline range. But here, the court was faithful to the guidelines and then was faithful to the rules as to what you do in terms of consecutive sentencing. When you have a guideline range that exceeds the guideline sentence that you want to impose that exceeds the statutory maximum. A huge difference. A huge difference, but fully justified, and again, no argument of substantive unreasonableness. Judge Diamond was very careful and I think very sage in the way he explained it. He said he wasn't punishing Mr. Javita for the crimes that were committed in Liberia. He was punishing Mr. Javita for the abuse of the asylum system. And this is a particular challenge for the United States. We have an immigration system. Of course, there's debate as to how open it should be, but no question, we continue to welcome immigrants. But there's a specific class of immigrants that we do not welcome. And those are the persecutors. Those are the human rights violators. And what Judge Diamond is doing here is not just deterring Mr. Javita, but very explicitly saying, I want to deter everybody else, which is an appropriate point of sentencing. He wants to communicate to the abusers of the world that we are not your refuge. And if you think you can do the unbelievable atrocities that Mr. Javita engaged in and then come here and find refuge here, this sentence says, no, you can't. That's not unreasonable. And the particular crime here, or crimes, would be 15 to 21 months. And what I'm trying to find out is, and to get there, you have to make the sentences consecutive. You have to give them, in effect, the max that could be, and then you make them consecutive. And going forward, what should we tell courts is the correct process? The correct process, I believe, is what's stated in Booker and stated in Gunter, which is, the judicial court has discretion to give a sentence outside the guideline range. Oh, I get that. Of course. Well, I know you do. You wrote it. And if the court does decide to do that, it needs to give a sufficient explanation that allows this court to review it. And what this court ultimately will review it for is substantive reasonableness, which, again, is the argument that hasn't been made here. If there is review for substantive reasonableness, the standard that this court stated in Tomko in the M-Bank decision, is a sentence that's substantively unreasonable only if no reasonable judge would impose it, affording tremendous discretion, as the Supreme Court has directed, to the sentencing judge. We cannot say, the defense has not tried to say, that no reasonable judge would impose this 30-year sentence, a sentence that is meant to be a clear and declaratory statement to the abusers of the world that we are not your home and we are not the place to come. That is completely appropriate. But in effect, one could look at it and say, I am punishing you today in this country for crimes that other people tell me that you committed outside this country. We could, but I think it's appropriate to take Judge Diamond at his word. You could not have a more careful and clear explanation of what the court was doing, and the court emphatically says that is not what it was doing. Instead, it gave a very reasonable explanation based on asylum law and the significance of enforcing our immigration laws. He did focus quite a bit on the atrocities that were committed in Liberia. But you say, but you're being punished for not, for lying about those. Is that your... Well, you're being punished for lying about it and you're being punished for seeking asylum in the United States and concealing these monstrosities. And the message is to, you know, it's a nasty world out there. And unfortunately, I hope these things don't recur, but they might. And the point that's being made here is if you are a war criminal like this and a leader and a war criminal like this, then you face a substantial punishment by abusing American immigration law. And the message is not just to you and it's not just to confine and deter you, but it's also to the other people out there. This is just sentencing 101. These are squarely within the proper rules of sentencing. What I'm trying to get is beyond the facts of this case. Keith, if you have three more minutes, please. There are, I've only found two cases that I can think of that relate to when a sentence is made consecutive. There's a Sixth Circuit case called Cochran. And from 2012, it says, Then you have the Seventh Circuit in a case called Nania, N-A-N-I-A, from 2013. Courts must correctly determine whether the guidelines recommend concurrent sentences. Is either of those relevant here? I don't believe so. Again, once the court states the guideline sentence that it wants to impose, and then it needs to follow the rules that it did regarding consecutive sentencing. But putting all that aside... The only thing here in the sentencing memorandum was on Appendix 11A, where it says I'm just going to sentence consecutively as sort of a conclusory sentence. And then you can infer later on that the judge was very, very concerned about the effect of the very significant testimony of these 12 or so witnesses. Well, what this court has often said is that there are no magic words. Sentencing is imposed orally. The judge is not reading from a script. Now, here the judge then wrote a 36-page opinion afterwards. But in general, there are no magic words. The court has to be able to... I get it. So now you're writing this opinion. And a judge in a case that's outside the normal realm, sentencing consecutively and not concurrently, when most judges would sentence concurrently, and how do we figure out whether that's... What are the rules by which that judge should sentence... can sentence consecutively, not necessarily should, can, and does the judge need to give a rationale for why he or she is doing that? So as a matter of law, the court can sentence consecutively. The statute never says you can't do it. It says you have to consider... But when you do, what should you do? But when you do, the court should give a sufficient explanation that permits this court to understand why it did it, even if it didn't use particular words such as, here is exactly why I'm giving consecutive sentences. There has to be a sufficient record from which this court can exercise meaningful review of what is obviously a decision to impose consecutive sentences. And then the final thing I have to say here, well, it's not final if the court has more questions, but the final thing that I want to say is that, once again here, we are on plain error review. We're talking about the procedural reasonableness of the explanation of consecutive sentencing. This is squarely within Flores-Mejia, this court's in-bank decision, that no objection was made. It could have been readily done to stand up and say, can you please say more about the consecutive aspect of this? That objection is not made until now. And so under Flores-Mejia, this is plain error review. That means the defense has the burden to show a reasonable probability that the sentence would have been different if Judge Diamond had said another couple words about consecutive versus concurrent sentencing. I don't think he could sustain that based on this record and the exhaustive explanation that he gave. As I understand the essence of your argument, the elevated sentence was necessary because of its deterrent value. That's what the judge said. It's not a haven for people who will commit crimes in other jurisdictions and then lie about it. Right. Is that fair to say? Right. But I'm looking at, of course, a presumptive 15 to 21 or 23 month sentence and comparing it with one that's, what was it, 320 months? 360. 360 months. Huge difference. Does it take that much in order to create a deterrent value to others who may be similarly inclined as Mr. Jabotay? I don't think we can say, again, that no reasonable judge  has a reasonable sentence for all the crimes he committed. This case is sui generis to some extent. We're talking about deterrence. Right. And here where you're specifically deterring is an offender of the type of Mr. Jabotay. There are war criminals and there are war criminals. I'm reminded standing here of the Kikamura case of this circuit many decades ago, but it was one of the early departure decisions as dramatic a departure. And what the case involved was simply possession of explosives, which had a relatively low guideline range. But then there was a massive departure to a similar sentence because that person was a terrorist who was transporting those explosives in order to go commit a terrorist act. And this court affirmed a similarly dramatic departure up to, I believe it was the 30 year sentence in Kikamura. I'm just going from memory here. This is very similar. You are dealing with the worst of the worst from the Liberian Civil War and the message that the judge says he wants to send is not only don't send us your worst, but especially don't come here if you are this type of leader, if you are the worst of the worst. Kikamura is K-I-K-U-M-U-R-A. It's from around 1991 or so. And I know your outstanding clerks can find it instantly. But again, it would seem that the typical case would be you would sentence a person to X period of time here, remove that person to in this case Liberia. And if the government there wishes to prosecute for the crimes this person purportedly committed back in the 1990s, it can do so. But I'm not saying and I'll never say that there are not multiple possible reasonable sentences. And of course, what the Supreme Court has said in Gaul and elsewhere is that just because an appellate court believes that they might have sentenced differently does not make a sentence unreasonable. The question under Tomko, and we're arguing a substantive claim that wasn't made, but the argument, the issue under Tomko is no reasonable judge would impose it. I don't think that, I think Judge Diamond gave such an explanation that that conclusion can't be reached. Final question here, which has not a whole lot to do with the law. Why such a great time lag from the person applying for asylum and having the 2011 interview and then later five years later before the person's even indicted? The information that proved the misconduct did not come to the government's attention until well after the 2011. Obviously, if it had, he wouldn't have been granted asylum or residency or anything else. Why the time lag from 2008, 2001, 2011? Is that how far back the system is? I think the answer, and I'm going to ask the trial prosecutors are here to correct me when I sit down if I'm wrong, but I think the answer is just the ordinary burdens that the immigration process faces and that this does take a long period of time. Applications do tend to stay for a while and that's what happened here. He applied for permanent residency in 2001. He was interviewed in 2007. I don't know why they didn't act on it then. Well, both. He was interviewed in 2007 and then again in 2011. And I believe it was just a lag in the immigration system, which is no benefit to him other than the fact that he got to stay here much longer without the government's awareness of his crime. And then what happened after 2011 between that and 2016? Information came to the government's attention that started an investigation that was an arduous, difficult investigation involving needing multiple trips to Liberia to find these people, to have these people bravely come forward. That took a good deal of time, but it didn't start until well after 2011. Thank you. Both the... Just one other preliminary question. What was the reasoning for why there was no argument made as to whether there was substantively an unreasonable sentence? Well, my my strategic reasoning for what it's worth is that there were. Everything I wanted to say that was wrong about the sentence could be subsumed under procedural and unreasonableness, that that is an easier standard just to prove on appeal, especially when you're up against plain error. And I don't think in all honesty that you can say that no judge, no reasonable judge could impose a 30 year sentence if he believed that someone had committed multiple murders under egregious circumstances and then lied about it. If that, if 30 years was an available sentence to him. And I just, I try to be reasonable and modest in constructing my arguments. This one is really off the charts, you're saying. It's sui generis. Yes, and you know what, Judge, I'm glad you asked that. I brought up here a copy of my brief. If you look at page 50 of my brief in footnote 33, there is a catalog of, describes the facts of cases in which, of cases of appeals and I think they're all appellate cases, of sentences imposed in human cases and how long the sentences were. And I don't think there's one including in real genocide case, a Rwandan case, over 15 years. So if you want to look at what other judges around the country think is reasonable, you can look, those are cases that were largely collected by Judge Diamond and then also supplemented by me. For example, 22 years. None of them are 33. One, the outlier case is a little over 20. The typical case is in the 10 to 15 year range. This doesn't seem, according to Mr. Sousmer, this is not your typical case. It's typical of these cases. It is not atypical for these kinds of cases. And if I may say about, may I just speak to the plain arrow question? Sure. What's plain under, because I hear this from the government all the time, to be plain under existing law, the government repeatedly says you have to find a case. But this court has rejected that argument in at least two published cases. I don't remember the names right now, but I could get them, but I'm sure you could also find them. What is the law? When you're talking about a statutory violation, the existing law is the statute. It's not a case about the statute. The law is the statute. This statute said, the 1546 statute, for example, whoever knowingly makes under oath any false statement in any application, affidavit, or other document. This is nonsense. Applications can be oral. It's an application or other document. Application means a written document on the plain language of the statute. And when you add to that, and by the way, it has to be material, you're not extending it to an oral statement. Statements can be made under oath in writing without, long before 1746. Mr. Sousmer is in effect saying statements can be made under oath orally with respect to a writing. Yes, they could. Yes, they could, but that's not what this statute says properly understood. Yet another clause was stuck in the middle of a meandering sentence to make it even worse, not for the purpose of, but with the result that it became harder to read and understand and misleading about what that phrase attached to. So the proper construction of 1546 is, has to be informed by what the language looked like before the materiality requirement was added expressly. And it is certainly not true that an oath in a written document couldn't be prosecuted until 1976. People signed documents in front of judicial officers. They signed documents in front of notaries for 200 years before 1976. That's what 1746 is about, isn't it? 1746 extended that the significance of the oath in writing from cases that were in writing after taking an oath in front of a judicial officer or a notary to those in which the person simply self-oaths. That is, says I, I declare this is under penalty of perjury. It did not add the new possibility of a written statement being under oath. It did not include circumstances in which there is no notary present or no judge present. That's all. Thank you very much. Thank you both counsel for extremely well-presented arguments. I would ask if you could have a transcript prepared of this oral argument and as split the cost, please. Very, very well done. Thank you.